IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 23, 2022

**JAMARCUS JACKSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Washington County**
**No. 45724     Stacy L. Street, Judge**

_____

**No. E2021-00642-CCA-R3-PC**
_____

The Petitioner, Jamarcus Jackson, appeals the denial of his petition for post-conviction relief from his convictions for second degree murder, misdemeanor assault, and misdemeanor reckless endangerment, arguing that he received ineffective assistance of counsel due to counsel's failure to subpoena critical defense witnesses. After review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and TIMOTHY L. EASTER, JJ., joined.

Patrick Denton, Johnson City, Tennessee, for the appellant, Jamarcus Jackson.

Herbert H. Slatery III, Attorney General and Reporter; Hannah-Catherine Lackey, Assistant Attorney General; Kenneth Baldwin, District Attorney General; and Fred Lance, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In 2017, the Petitioner was convicted by a Washington County jury of second degree murder, misdemeanor assault, and misdemeanor reckless endangerment and sentenced by the trial court to an effective term of forty years in the Tennessee Department of Correction, to be served consecutively to his eight-year sentence in an unrelated case. His convictions and sentence were affirmed by this court on direct appeal, and our supreme court denied his application for permission to appeal. *State v. Jamarcus Jackson*, No. E2017-01182-

CCA-R3-CD, 2018 WL 3409927, at *1 (Tenn. Crim. App. July 12, 2018), *perm. app. denied* (Tenn. Nov. 15, 2018).

The Petitioner's convictions arose out of his altercation with a fellow patron at a Johnson City nightclub, "The Battery," in the early morning hours of March 23, 2014. *Id.* After a night of drinking, which included earlier confrontations with other patrons of the club, the Petitioner was bumped by the murder victim, Deshaun Greer ("the victim"). *Id.* Soon thereafter, multiple fights broke out in the club, which prompted the bouncers to order everyone outside. *Id.* In the general chaos that followed, the Petitioner went to his date's vehicle, retrieved his handgun, walked back, and fired multiple shots directly at the victim, killing him. *Id.* at *2-3. One of the bullets caused minor injuries to club patron Zachary Breedlove and another bullet narrowly missed striking club patron Jonathan McInturff. *Id.* at *5.

The Petitioner was subsequently indicted for first degree premediated murder based on the shooting death of the victim, misdemeanor assault based on the injury caused to Mr. Breedlove, and felony reckless endangerment based on the bullet's near-miss of Mr. McInturff. [1] *Id.* at *1.

A number of witnesses testified for the State at trial, including: the Petitioner's date, Amanda Chappell, who described the angry Petitioner's retrieval of his gun from her vehicle; John Calandros, a bouncer at the club, who testified that he calmed the agitated victim, who initially wanted to fight the Petitioner, while the victim was still inside the club and then followed him outside, where he saw the Petitioner approaching and the victim walking casually to within four or six feet of the Petitioner before the Petitioner pulled out his gun and shot the victim; James Phillips, another bouncer at the club, who described the victim's running toward the Petitioner before the Petitioner took out his gun and began firing; John Lawson, a patron of the club, who testified that the victim froze in place when the Petitioner, who had approached the victim, pulled out his gun and fired at the victim's chest until he had emptied the rounds in his gun; Johnson City Police Detective Bret Richardson, who testified that ten .40 caliber cartridge casings were recovered from the scene; and Tennessee Bureau of Investigation Forensic Scientist Teri Arney, who determined that all ten rounds had been fired from the Petitioner's gun. *Id.* at *1-5.

The Petitioner elected not to testify and presented no witnesses in his defense. *Id.* at *6.

---

[1] According to trial counsel's evidentiary hearing testimony, the Petitioner was also indicted for the attempted second degree murder of the victim's brother, Jamison Greer, but that count was dismissed before trial.

Among the several issues the Petitioner raised in his direct appeal was whether the evidence was sufficient to sustain his second degree murder conviction. Specifically, he argued that the proof established that he acted in self-defense. *Id.* Our direct appeal opinion provides analysis of this issue:

Viewed in the light most favorable to the State, the evidence shows that the victim bumped into the [Petitioner] inside The Battery and that they argued. The [Petitioner] and the victim had been drinking alcohol, and the [Petitioner] had been involved in earlier arguments with individuals other than the victim at the club. After the [Petitioner] left the club, the victim was agitated, but Mr. Calandros was able to calm the victim before the victim left the club. The [Petitioner], who was angry, went quickly to Ms. Chappell's car and searched for his gun. After he found the gun, the [Petitioner] put it in his pants and returned on foot to the area outside the club. The [Petitioner] appeared agitated as he returned and stopped to stare at the victim. The victim walked or ran toward the [Petitioner] and, when they were about four to six feet apart, the victim "kind of froze." The [Petitioner] took out the gun and fired repeated shots, three of which struck the victim in the torso. The evidence shows that the [Petitioner] engaged in conduct that he was aware was reasonably certain to cause the victim's death.

Relative to the [Petitioner's] self-defense claim, no evidence showed that the victim was armed, that he physically assaulted the [Petitioner], or that the victim threatened to harm the [Petitioner]. To the contrary, although the evidence shows that the victim had been upset and had advanced toward the [Petitioner], the unarmed victim stopped and stood a few feet from the [Petitioner], but the [Petitioner] pulled out the gun and opened fire. The evidence does not support a conclusion that the [Petitioner] had a reasonable belief he was in imminent danger of death or serious bodily injury, that actual danger existed or that the [Petitioner] had an honest belief of actual danger, or that the [Petitioner] had a reasonable basis for believing he was in such danger. Further, the evidence does not show that the force used by the [Petitioner] was reasonable in response to any potential threat the [Petitioner] might have perceived when the victim advanced and stopped to stand near him.

*Id.* at *7.

On November 4, 2019, the Petitioner filed a pro se petition for post-conviction relief in which he raised a claim of ineffective assistance of counsel. Following the appointment of post-conviction counsel, the Petitioner filed an amended petition alleging that his trial

counsel was ineffective for, among other things, failing to subpoena Joshua Mould and Jamison Greer as witnesses to corroborate the Petitioner's claim of self-defense.

At the evidentiary hearing, the Petitioner testified that he was standing by a railing when a group of people saw him and began screaming, "There he goes, go get him. Go get him. Go f*** him up." He said that both the victim and the victim's brother, Jamison Greer, began to charge him. He stated that club bouncer Joshua Mould grabbed the victim to stop him, but the victim broke free and continued running toward the Petitioner. The Petitioner testified that he did not shoot until the victim drew back to hit him.

The Petitioner testified that he related the above account to trial counsel. He said he met "quite a few" times with counsel and at each meeting discussed with counsel the importance of having Joshua Mould and Jamison Greer as witnesses to corroborate the Petitioner's position that the victim was the first aggressor. Based on his repeated conversations with counsel, the Petitioner understood that both men were slated to testify as defense witnesses.

The Petitioner testified that he was still operating under the belief that Joshua Mould and Jamison Greer were going to be part of the defense proof after the State had completed its proof and trial counsel asked him if he wanted to testify in his own defense. He said trial counsel advised him that it would not be in his best interest. He stated that he and trial counsel "agreed on that and everything else was supposed to be Joshua Mould, Jamison Greer and the rest of the bouncers to the defense." According to the Petitioner, trial counsel never even hinted at the possibility that Joshua Mould and Jamison Greer would not appear as defense witnesses.

At this point in the hearing, post-conviction counsel described his unsuccessful attempts to locate or contact either potential witness. Post-conviction counsel requested that the court declare both men unavailable pursuant to Rule 804(a)(5) of the Tennessee Rules of Evidence and admit their preliminary hearing testimony. Noting that it was a post-conviction hearing versus a trial, the post-conviction court admitted the preliminary hearing transcript as an exhibit to the hearing. Further noting that the requested evidence consisted of testimony at a probable cause preliminary hearing where the witnesses were not cross-examined on the issue of self-defense, the court stated that it would give such evidence "the weight that it is afforded given those circumstances."

On cross-examination, the Petitioner acknowledged that Mr. Mould testified at the preliminary hearing that he saw the Petitioner pull out a gun and shoot the victim in the chest and stomach. He insisted, nonetheless, that Mr. Mould's testimony would have been helpful because he described the victim as advancing on the Petitioner. As for Mr. Greer, the Petitioner believed he would have been helpful to his defense because he testified at

the preliminary hearing that the victim had been in an altercation with the Petitioner earlier in the evening, that the victim had been moving toward the Petitioner when he was shot, and that Mr. Greer had tackled the Petitioner after the shooting. The Petitioner agreed that Mr. Greer also testified that the Petitioner flashed a gang sign in the club at the victim and Mr. Greer, hit Mr. Greer inside the club, and threatened to kill Mr. Greer when Mr. Greer tackled him after he shot Mr. Greer's brother.

The Petitioner insisted that trial counsel promised that he would call both Mr. Greer and Mr. Mould as defense witnesses. He denied that counsel ever discussed the possibility that either witness would not be that helpful to the defense. He said Mr. Greer was sitting in the courtroom during the trial, but trial counsel never called him as a witness. Finally, the Petitioner expressed his belief that he would not have been convicted had trial counsel called Mr. Greer and Mr. Mould as defense witnesses.

Trial counsel testified that he had handled over fifty jury trials, including several murder trials, during his career. He said he met with the Petitioner numerous times and that the Petitioner was involved in every decision he made about the case. He stated that he reviewed the transcript of the preliminary hearing and hired an investigator to interview all the witnesses who had either testified at the preliminary hearing or given statements to the police.

Trial counsel agreed that both Joshua Mould and Jamison Greer potentially could have offered beneficial testimony for the defense at trial. He stated that he and his investigator went twice to Mr. Greer's home, located in a town south of Nashville, in an attempt to talk with him. Although there were vehicles in the driveway, no one answered the door. Trial counsel was confident that he left his contact information along with a request that Mr. Greer call him, but Mr. Greer never reached out to him.

Trial counsel testified that he attempted to talk with Mr. Greer during the trial, but Mr. Greer was hostile and uncooperative. Trial counsel said his co-counsel also attempted to talk to Mr. Greer, but she was unsuccessful. Trial counsel explained that he was very reluctant to call Mr. Greer as a witness because of his patent hostility and counsel's belief that he would attempt to "do as much damage to [the Petitioner] as he could." Trial counsel testified that he discussed his concerns with the Petitioner at the jail the night before they rested their defense. He recalled that his investigator was also present, as well as possibly his co-counsel. Ultimately, trial counsel made the strategic choice that it would be too risky to call Mr. Greer as a witness. Trial counsel testified that the Petitioner participated in the decision not to call Mr. Greer as a witness.

Trial counsel testified that he had relied on the State's subpoena of Mr. Mould as a witness for trial. Approximately one week before the trial began, trial counsel learned that

the State had released Mr. Mould from its subpoena. Trial counsel, therefore, had his own subpoena issued on November 4. He said his investigator tracked Mr. Mould to a rehabilitation facility in Nashville and hired an investigative firm from Murfreesboro to serve the subpoena. The rehabilitation facility, however, denied them access to Mr. Mould.

Trial counsel testified that he and his investigator met with the Petitioner on November 6 to inform him of their difficulty in serving Mr. Mould with the subpoena. He said they discussed the similarities in Mr. Mould's potential testimony to the testimony of other witnesses, but counsel also offered to contact the court to request a continuance of the trial until Mr. Mould was available. He said he left it up to the Petitioner to decide, and the Petitioner opted to proceed with the scheduled trial.

Trial counsel agreed that, even had he been available, Mr. Mould's testimony would not have been entirely favorable to the Petitioner, as the Petitioner did not have what counsel considered to be a "classic self-defense case." He said he informed the Petitioner that they would attempt to show that he acted in self-defense but the best outcome that he believed the Petitioner could expect was for the jury to find that he was provoked and return a verdict of guilty of voluntary manslaughter.

On cross-examination, trial counsel testified that he had a conversation with the Petitioner about the pros and cons of every potential witness. He said he told the Petitioner about Mr. Greer's hostility and expressed his belief that Mr. Greer would attempt to sabotage the Petitioner's case as much as he possibly could. He also explained to the Petitioner the pros and cons of requesting a continuance to call Mr. Mould as a witness. The Petitioner, who was in confinement pending the trial, was anxious to proceed with the trial. When asked if he had the Petitioner sign anything to acknowledge that he wanted to proceed despite Mr. Mould's unavailability, trial counsel replied that he could not locate anything in his file.

Trial counsel agreed that Mr. Mould's testimony could have been helpful but disagreed that it would have caused the jury to return a verdict of voluntary manslaughter. On this point, trial counsel pointed out that Mr. Mould's preliminary hearing testimony was not that he was trying to stop the victim from attacking the Petitioner, but instead that he was trying to stop him from confronting the Petitioner. Trial counsel said that, in hindsight, he should have issued a "double subpoena" for Mr. Mould and that he would not make the mistake of relying on the State's subpoena in the future.

On redirect examination, trial counsel testified that he never found any evidence that the victim attacked the Petitioner outside the nightclub.

On May 19, 2021, the post-conviction court entered a detailed written order denying the petition. Among other things, the court accredited the testimony of trial counsel that he discussed with the Petitioner the pros and cons of calling the witnesses, kept the Petitioner fully informed of his difficulties with Mr. Mould and Mr. Greer, and made the strategic choice, in consultation with the Petitioner, of not calling Mr. Greer as a witness and not requesting a continuance to secure Mr. Mould's appearance at trial. The court further found that neither witness's testimony would have changed the outcome of the trial, in which multiple witnesses offered similar testimony and the proof of the Petitioner's guilt was overwhelming.

## ANALYSIS

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petitioner bears the burden of proving factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *See Wiley v. State*, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the post-conviction court's findings as to the credibility of witnesses or the weight of their testimony. *Id.* However, review of a post-conviction court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's

errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982).

The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; *see also Goad*, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim.").

On appeal, the Petitioner argues that the post-conviction court erred in finding that trial counsel's failure to call the witnesses did not constitute ineffective assistance of counsel. The Petitioner asserts that the testimony of Mr. Greer that the victim was advancing on the Petitioner would have added an important "layer of confirmation" to the Petitioner's self-defense argument and that the testimony of Mr. Mould that he had to physically restrain the victim from confronting the Petitioner constituted "crucial, irreplaceable testimony" in support of the victim's having been the first aggressor. The State responds by arguing that the post-conviction court properly denied the petition because the Petitioner failed to show either a deficiency in counsel's performance or prejudice to his case. We agree with the State.

Trial counsel's testimony, which was accredited by the post-conviction court, established that trial counsel fully communicated with the Petitioner about the difficulties with the potential witnesses, advised the Petitioner about his legitimate concerns with calling the victim's brother as a hostile defense witness, and offered the Petitioner the

choice of either requesting a continuance to attempt to secure the appearance of Mr. Mould or proceeding with the trial. According to trial counsel, the Petitioner chose to proceed with the scheduled trial without Mr. Mould as a witness and agreed with and participated in trial counsel's strategic choice not to risk calling Mr. Greer as a witness. The Petitioner has not, therefore, met his burden on demonstrating that counsel was deficient in his performance. The Petitioner has also failed to meet his burden of showing that counsel's failure to call these witnesses resulted in prejudice to his case. From the transcript of the preliminary hearing, it is clear that these witnesses would have provided, at best, only minimal support for the Petitioner's case. Both testified that the victim was unarmed. Mr. Mould additionally testified that the Petitioner pulled out his gun and shot the victim in the chest and stomach, and Mr. Greer additionally testified about the Petitioner's violent behavior inside the club, his flashing of gang signals, and his threat to kill Mr. Greer. Moreover, the key testimony that the witnesses would have presumably provided - - that the victim advanced toward the Petitioner before the fatal shot - - was provided at trial by other witnesses.

The Petitioner concedes "that the standard of law currently places the burden of proof on the Petitioner to show by clear and convincing evidence that he . . . did not knowingly waive Mr. Mould's attendance to testify at his trial." The Petitioner asserts, however, that the right to compel the attendance of a witness is a fundamental right, which should have placed the burden on the State to show that the Petitioner knowingly waived that right. In support, the Petitioner cites *State v. Maurice Lydell Purdy*, No. 02C01-9807-CC-00211, 1999 WL 188177 (Tenn. Crim. App. Apr. 7, 1999), in which this court reversed the post-conviction court's denial of the petitioner's request for a delayed appeal because there was no evidence in the record that the petitioner intended to waive his right to a direct appeal. *Id.* at *4. The facts in this case are readily distinguishable from those in *Maurice Lydell Purdy* not only because the petitioner in *Maurice Lydell Purdy* was denied his constitutional right to a direct appeal of his conviction, but also because here, unlike in that case, there was evidence in the record, through the testimony of trial counsel, that the Petitioner intended to waive his right to call Mr. Mould as a defense witness. We, therefore, affirm the judgment of the post-conviction court.

## CONCLUSION

Based on our review of the record, we affirm the denial of the petition for post-conviction relief.

_____
JOHN W. CAMPBELL, SR., JUDGE

- 9 -